IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 20-60083 |
| | § | |
| SNAP KITCHEN INVESTMENTS, LLC, *et al.*, | § § | Chapter 11 Subchapter V |
| | § | |
| Debtors.¹ | § | (Joint Administration Requested) |

**DECLARATION OF TONY SMITH**
**IN SUPPORT OF FIRST DAY MATTERS**

I, Anthony "Tony" Smith, do hereby declare as follows:

1. My name is Tony Smith. I am over the age of eighteen years, I have never been convicted of a felony or crime of moral turpitude, and I am otherwise qualified to make this declaration. The factual matters set forth herein are within my personal knowledge and are true and correct.

2. I am the interim Chief Executive Officer of Snap Kitchen Investments, LLC ("SKI" or the "Debtor"), a company organized under the laws of Texas and one of the debtors and debtors-in-possession in the above-captioned Bankruptcy Cases. I have served as interim Chief Executive Officer ("CEO") since April 1, 2020. I am also the CEO of each of SKI's affiliated Debtors. I am familiar with the Debtors' operations, including their financial affairs, products and services offered, and books and records.

3. I have more than fifteen (15) years of experience in the management, operations, and development of food-services businesses. For the four (4) years prior to becoming the interim CEO of the Debtors, I served as the CEO of Bruxie Chicken. Before Bruxie Chicken, I was the

---

¹ The "Debtors" in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Snap Kitchen Investments, LLC (4938); Snap Kitchen Management, LLC (4886); Snap Kitchen Services, LLC (4910); Snap Kitchen Dallas, LLC (6157); Snap Kitchen #1, LLC (4938); Snap Kitchen #2, LLC (4948); Snap Kitchen #3, LLC (4589); Snap Kitchen #5, LLC (4635); Snap Kitchen Philadelphia, LLC (9116).

President of Paul Martin's American Grill, charged with scaling the business from a two-store brand with less than $10 million in revenue to twelve stores in multiple states with an annual revenue in excess of $50 million. Prior to Paul Martin's American Grill, I was the Director of Operations for RA Sushi Bar & Restaurant, overseeing the food services operations of a dozen locations across Arizona, California, Nevada, Georgia, and Florida.

4.  I submit this Declaration to assist the Court and parties in interest in understanding the circumstances that compelled the filing of the Debtors' respective chapter 11 bankruptcy cases (the "<u>Bankruptcy Cases</u>") and to support the Debtors' request for relief on various motions and requests for relief contemporaneously filed with this Declaration.

5.  Except as otherwise indicated, the statements in this Declaration are based upon my personal knowledge, discussions with the Debtors' management, directors, and advisors, review of the Debtors' documents and information, and/or opinions based on my experience and knowledge in the food service industry.

### The Debtors and Their Operations
### "Healthy Food for busy people – consider your meal prep done."

6.  SKI, through its two kitchen locations, point-of-sale brick and mortar stores, and direct-to-customer operations (collectively, "<u>Snap Kitchen</u>"), offers healthy, affordable prepared meals for sale in its Texas retail locations and online nationwide.[2] Each week Snap Kitchen prepares approximately 150,000 meals from freshly sourced ingredients, offering breakfast, lunch and dinner, soups and salads, snacks, drinks and juices, as well as sweets.

7.  Beginning in 2010 with one retail location and kitchen in Austin, Texas, Snap Kitchen expanded, at one time, to more than forty retail locations across Texas, Philadelphia, and Illinois. Like any fast paced and quickly growing business, however, not all strategic decisions

---

[2] *See* http://www.snapkitchen.com.

were profitable and/or sustainable.  For instance, expansion into certain markets, such as Chicago, yielded insufficient sales to continue operations.  Also market exploration in diet-food sales were unsuccessful.  For these reasons, Snap Kitchen focused on consolidating its successful operations and market segments throughout 2018 and 2019, including maintaining its most popular retail locations, building a stronger online presence, and maximizing economies of scale by concentrating all of its food preparation operations in two industrial-sized kitchens.  In revising its business model to focus on these segments, and shedding the proverbial fat of the less successful operations, Snap Kitchen entered 2020 on a positive, confident trajectory for future profitability.

8.  Despite recent business "right-sizing" progresses, however, the ongoing pandemic caused by the novel Coronavirus ("COVID-19") has created unnavigable strain on Snap Kitchen's operations and liquidity.  COVID-19 and the resultant state and local restrictions on retail business operations, increased costs to maintain safe working environments, and related impediments to normal, pre-pandemic business operations, has simultaneously reduced sales and increased costs.  Though Snap Kitchen's employees and representatives have worked tirelessly during this pandemic, and its customers have proven themselves extremely loyal, economic realities of the time have caused me to conclude that Snap Kitchen's business is beyond ordinary commercial repair.  Accordingly, I believe that the Debtors' request for protection pursuant to title 11 of the United States Code (the "Bankruptcy Code"), and specifically subchapter V of chapter 11 of the Bankruptcy Code, is the best and likely only means to navigate Snap Kitchen, in its reorganized form, through these trying times to the mutual benefit of Snap Kitchen's stakeholders and its customers.

A. **Company Background and Operations**

9. Snap Kitchen was established and incorporated in 2009 as a Texas limited liability company. In 2010, Snap Kitchen opened its first retail store in Austin, Texas, where it sold pre-packaged healthy meals cooked directly on site. Following a successful opening and strong sales, the Snap Kitchen aggressively expanded throughout Austin, Texas, and ultimately into Houston, Dallas, Chicago, and Philadelphia.

10. At its zenith, the Debtor operated more than forty (40) retail locations with more than 500 employees. As of December 4, 2020 (the "Petition Date"), after certain "right-sizing" efforts, the Debtors now operate 6 retail stores and have approximately 190 employees (and approximately 75 additional temporary employees provided by staffing partners).

11. Snap Kitchen offers its product-line in several convenient ways to its customer base. First, customers can shop directly in the Debtors' retail locations, by picking out meals from the varied refrigerated sections that line the walls with different meal types and meal sizes. Second, our customers can "order ahead" through the Debtors' proprietary phone app and/or website, pre-selecting from its available menu, and then picking up their purchase at the selected retail location with little to no wait. Third, customers can pre-order products several days in advance for delivery to a retail location with the same convenient and easy pick-up option. Forth, Snap Kitchen's subscription service allows customers to order up to a week in advance, with their order and prepared meals being delivered directly to their doorstep. Lastly, through agreements with grocery store chains like Whole Foods, Snap Kitchen products are available for purchase in in certain grocers throughout the United States, giving customers even more options and convenience when eating healthy.

**B. Events Leading to These Chapter 11 Cases**

12. From 2010 through 2014, Snap Kitchen's business model proved successful and profitable, drawing investment opportunities from grocery chain Whole Foods, private equity investor L Catterton, and personal (and primary) investor Bradley Radoff. Following this success, however, and after numerous difficulties with expansion into different markets product and geographic markets, the business became overleveraged, and saw a significant loss year-over-year beginning in 2014. In order to turn the tides, Snap Kitchen, in 2018 and 2019, consolidated its successful operations and centralized its cooking operations into two industrial kitchens located in Dallas and Philadelphia, where currently 75,000 and 50,000 meals are prepared per week, respectively.

13. Despite the correction in course, however, the COVID-19 pandemic severely impacted Snap Kitchen's revenues, including:

- A 30% drop in revenues due to the significant reduction in foot-traffic at all of its retail locations caused by the government shutdowns;

- A growing direct-to-consumer segment of Snap Kitchen that was not sufficiently developed to support the retail-heavy enterprise, operations, and kitchen capacity; and

- Heightened liquidity issues, with diminished ability to raise capital.

14. This dangerous combination of aggressive growth and an unforeseen pandemic has made the present business model unsustainable. Now, Snap Kitchen seeks to restructure its business in these Bankruptcy Cases, including continuing operations at selected retail locations that are best-positioned for future profitability and focusing on a more sustainable direct-to-consumer business model.

C. **The Snap Kitchen Entities**

15. SKI, the proposed lead Debtor in these Bankruptcy Cases, wholly owns various subsidiary operating (and certain non-operating) Snap Kitchen entities (the "SKI Subsidiaries"). Certain of the SKI Subsidiaries were chosen to reorganize under these proceedings based on their potential for future profitability and/or their need within the reorganized Snap Kitchen enterprise (e.g., the Debtors are either linked to a retail location or kitchen, or provide employee and management support, that is vital to Snap Kitchen's reorganization). Snap Kitchen's organizational chart is attached hereto as **Exhibit A**. In relevant part, the Debtor entities, each of which are currently operating as of the Petition Date, are as follows:

   a. Austin area retail locations—Snap Kitchen #3, LLC; Snap Kitchen #5, LLC; and Snap Kitchen #1, LLC;

   b. Houston area retail location—Snap Kitchen #2, LLC;

   c. Dallas area retail location and Dallas kitchen (the largest Snap Kitchen kitchen)—Snap Kitchen Dallas, LLC; and

   d. The Northeastern kitchen—Snap Kitchen Philadelphia, LLC.

16. The two remaining Debtors provide necessary employment and management services. Snap Kitchen Services, LLC ("SK Services") employs and provides all of Snap Kitchen's hourly employee services, and Snap Kitchen Management, LLC ("SK Management") employs and provides the management services and personnel. Together with SKI, which predominantly serves as a financial and shared services parent company, these Debtor entities comprise a viable, post-reorganization Snap Kitchen business.

17. .The remaining non-debtor entities below SKI in the corporate hierarchy are expected to either liquidate or dissolve (the "Non-Debtor Subsidiaries"). These Non-Debtor

Subsidiaries include now-closed retail locations and entities created for prospective, but never realized, growth into additional markets.[3]

### D. The Debtors' Obligations

18. Until recently, the Debtors did not carry traditional secured debt obligations. Snap Kitchen was capitalized through equity investment and unsecured notes, and paid its bills in the ordinary course of business through a combination of business cash flow and above-described capital raises.

19. Based on pandemic-affected cash flow reduction, however, and in order for Snap Kitchen to continue until it could file these Bankruptcy Cases, SKI entered into two bridge loans (the "Bridge Loans") with the Debtors' principal equity holder and investor Bradley Radoff, through his special purpose lending entity, WNTB, LLC (the "DIP Lender"). These Bridge Loans were evidenced by that certain *Secured Promissory Note* dated November 17, 2020, and that certain *Secured Promissory Note* dated December 1, 2020, in the aggregate principal amounts of $450,000.00 and $275,000.00, respectively.

20. The Bridge Loans, by definition, were made in amounts sufficient to carry the Debtors' operations into these Bankruptcy Cases. The Debtors require additional funding in order to continue operations during these Bankruptcy Cases and to successfully emerge as reorganized entities. Accordingly, the Debtors file their *Emergency Motion of Debtors for an Order (I) Authorizing the Debtors to Obtain Post-Petition Financing, (II) Authorizing the Debtors to use Cash Collateral, (III) Granting Adequate Protection to the Prepetition Secured Party, (IV)*

---

[3] Snap Kitchen #6, LLC and Snap Kitchen #13, LLC operated stores in Austin that are now closed. Snap Kitchen #4, LLC; Snap Kitchen #8, LLC; Snap Kitchen #9, LLC; and Snap Kitchen #12, LLC operated stores in Houston that are now closed. In both Dallas and Philadelphia areas, retail locations were not operated through special purpose entities; accordingly, certain stores operated by Snap Kitchen Dallas, LLC and Snap Kitchen Philadelphia, LLC are now closed. Snap Kitchen New York, LLC; Snap Kitchen Atlanta, LLC; Snap Kitchen DC, LLC; and Snap Kitchen Baltimore, LLC were each entities created for market expansion, but for which no business was ever meaningfully conducted.

*Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "DIP Motion") and request approval of a debtor-in-possession loan in the principal sum of $2,725,000.00, including $2,000,000.00 in new-money post-petition financing from the DIP Lender by that certain Post-Petition Financing Promissory Note and roll-up of the Prepetition Secured Debt, as set forth in that certain Ratification and Lending Agreement. The DIP Motion is described in a more fulsome manner below.

21. Additionally, Debtors SK Management and SK Services, in order to satisfy payroll obligations, applied for and obtained loans through the Paycheck Protection Program established by the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"). Horizon Bank, SSB, issued promissory notes to SK Services in the amount of $2,196,800 and to SK Management in the amount of $1,846,200 (collectively, the "PPP Loans") and funded the same. As of the Petition Date, no action has been taken in connection with the PPP Loans.

22. The Debtors' other debts consist of ordinary trade debt, including (a) vendors needed in the cooking, packaging, and shipping of its food products; (b) landlords, utility providers, and similar vendors relating to the kitchens, retail locations, and management office; and (c) employee/management costs. Certain equipment used in the Debtors' business is purchase money financed or lease-to-own. Excluding the PPP Loans but including the DIP Facility, the outstanding non-contingent liabilities of the Debtors total approximately $5,000,000.00.

## The First-Day Motions

23. Concurrently with the filing of these Bankruptcy Cases, the Debtors have filed various first-day motions (the "First-Day Motions") requesting certain relief on an expedited basis. The First-Day Motions serve the purpose of protecting and preserving the Debtors' estates, including by ensuring timely payment of employees, critical vendors, and utilities. Further, the

Debtors seek interim and final approval of post-petition financing to ensure the Debtors have sufficient working capital to continue operations. Finally, the First-Day Motions include relief related to the efficient administration of these Bankruptcy Cases, including jointly administering the same and seeking limited notice to save costs. I believe that the relief requested in each of the First-Day Motions is appropriate and tailored to protect and preserve the estates by, among other things, ensuring an orderly transition for operating the Debtors' business in Chapter 11.

### A. Motion for Joint Administration and Related Relief ("Joint Administration Motion")

24. By the Joint Administration Motion, the Debtors seek entry of an order directing (i) the consolidation and joint administration of these Bankruptcy Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b); (ii) the use of a single case docket; (iii) the use of a consolidated case caption; and (iv) the use of a consolidated list of thirty (30) unsecured creditors holding the largest claims against one or more of the Debtors.

25. Bankruptcy Rule 1015(b) provides, *inter alia*, that the court may order a joint administration of estates where, as here, two or more petitions are pending in the same court by a debtor and an affiliate. Fed. R. Bankr. P. 1015(b). The lead Debtor in these Bankruptcy Cases is SKI. All other Debtors are wholly-owned subsidiaries of SKI. Accordingly, these Debtors are "affiliates" as defined in section 101(2) of the Bankruptcy Code.

26. Joint administration will benefit the Debtors, the Court, the Office of the Clerk, the Office of the United States Trustee for Region 6 (the "U.S. Trustee"), and all other interested parties. Many of the motions, applications, notices, orders, and other documents that will be filed and entered in these Bankruptcy Cases will relate to, and affect, all of the Debtors collectively. Using a single, general case docket will relieve all parties and the Court of the burden and related expense of filing and entering duplicative documents in each of these Bankruptcy Cases and monitoring multiple dockets to stay apprised of developments.

27. The proposed joint administration of these Bankruptcy Cases will realize cost savings and reduce the administrative burdens on these Debtors, including by sending a single set of notices to a single matrix of creditors and the Rule 2002 list, rather than sending multiple notices to multiple different creditor lists.

28. The Debtors further request that the Court approve and require for use on all documents filed and entered in the jointly administered cases the following consolidated case caption:

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | § § | Chapter 1 Case No. 20-_____ |
| SNAP KITCHEN INVESTMENTS, LLC, *et al.*,[1] | § § § | Chapter 11 Subchapter V |
| Debtors. | § § § | (Jointly Administered) |

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Snap Kitchen Management, LLC (4886); Snap Kitchen Services, LLC (4910); Snap Kitchen Dallas, LLC (6157); Snap Kitchen #1, LLC (4938); Snap Kitchen #2, LLC (4948); Snap Kitchen #3, LLC (4589); Snap Kitchen #5, LLC (4635); Snap Kitchen Philadelphia, LLC (9116).

29. The consolidated caption relieves parties from including each of the Debtors' names, tax identification numbers, and case numbers on filed documents, simplifying administration of these Bankruptcy Cases.

30. The relief requested in the Joint Administration Motion does not prejudice or affect in any way the substantive rights of any party; rather, the relief requested relates solely to procedural and administrative matters. The relief requested is thus reasonable and appropriate

under the circumstances and in the best interests of the Debtors, their estates, and all parties-in-interest.

### B. Motion for an Order Authorizing the Debtors to Limit Notice and Maintain a Consolidated Master Service List ("Motion to Limit Notice")

31.     The Debtors anticipate collectively having approximately 2,000 notice parties. Many of these parties are current and former employees, current and former vendors, and other parties who are likely to have limited to no interest in these Bankruptcy Cases, but who are listed by the Debtors out of an abundance of caution. The costs associated with photocopying and service of routine pleadings on all 2,000 notice parties would be substantial and burdensome on the Debtors' estates. Accordingly, I believe it would be appropriate to limit notice in these Bankruptcy Cases so that the Debtors (and other filing parties in these Bankruptcy Cases) do not incur large and reoccurring expenses in serving pleadings.

32.     Therefore, the Motion to Limit Notice requests an order approving a procedure by which an official consolidated master limited service list would be established (the "Master Service List"). The Master Service List would include the following parties: (i) the Office of the United States Trustee for the Southern District of Texas; (ii) the Debtors; (iii) the Debtors' professionals; (iv) the secured creditor of the Debtors; (v) the holders of the 30 largest unsecured claims against the Debtors; (vi) those persons who have formally appeared in the Bankruptcy Case and requested service of pleadings; (vii) all applicable government agencies to the extent required by the Bankruptcy Rules and the Local Rules; and (viii) all known counsel for the foregoing.

33.     The Debtors further propose that notice of any filing in the Bankruptcy Case, other than an event or deadline that must be served on all creditors pursuant to Bankruptcy Rule 2002, be served only on (a) the parties on the Master Service List, (b) any party who has filed a notice

of appearance and request for service of pleadings in the Bankruptcy Case but has not yet been added to the Master Service List, and (c) any party whose interests the specific filing affects.

34. The Debtors propose to file the initial Master Service List within three (3) days after entry of an order on the Motion to Limit Notice. A revised list would then be filed seven (7) days after the initial master service list is filed, and it would be updated and filed on the docket (i) every seven (7) days during the first thirty (30) days of the case; (ii) every fifteen (15) days during the next sixty (60) days of the case; and (iii) every thirty (30) days thereafter.

C. **Motion to Maintain Prepetition Bank Accounts (the "Cash Management Motion")**

35. The Cash Management Motion requests entry of an order granting the Debtors authority to (i) maintain their existing bank accounts and cash management system in the ordinary course of business; (b) continue using their existing business forms; and (c) use good faith efforts to cause their banks, as necessary, to convert existing bank accounts to DIP accounts.

36. The Debtors bank exclusively with Bank of America, N.A. ("BOA"). As of the Petition Date, the Debtors hold the following accounts:

| Bank Account Name | Market | Account Number Ending | Account Type |
|---|---|---|---|
| Snap Kitchen Investments LLC | n/a | 0874 | Dep + Master |
| Snap Kitchen Dallas LLC Concentration | DAL | 0330 | TFR Master |
| Snap Kitchen Dallas LLC Dallas Store Deposits | DAL | 3882 | Dep + Sub |
| Snap Kitchen Management LLC | n/a | 0890 | Dep + Sub |
| Snap Kitchen Services LLC | n/a | 0887 | Dep + Sub |
| Snap Kitchen #1 LLC | AUS | 0861 | Dep + Sub |
| Snap Kitchen #2 LLC | HOU | 4942 | Dep + Sub |
| Snap Kitchen #3 LLC | AUS | 5019 | Dep + Sub |
| Snap Kitchen #5 LLC | AUS | 3928 | Dep + Sub |

37. BOA is an approved depository institution listed on the *Southern/Western Districts of Texas List of Approved Depositories (August 5, 2020).*[4] The Debtors seek authority to convert the existing BOA accounts into DIP accounts. The Debtors have various online customers who pay directly into one or more of these accounts. Changing account numbers would needlessly disrupt the Debtors' cash flow and receivables at a time when the Debtors can least afford such issues. Further, because BOA is already an approved depository institution, and if BOA will convert the accounts, there is no substantive difference between opening new DIP accounts and simply converting the current accounts to DIP accounts.

38. Finally, the Debtors maintain a customer loyalty program (the "Loyalty Program"), whereby for every $100 spent at Snap Kitchen, customers receive $5 in "Snap Funds." This program has been ongoing and is set to expire at the end of this year. Currently, there exists approximately $430,000.00 worth of outstanding Snap Funds that have not been redeemed. For this reason, and to keep our client base strong during these proceedings, we wish to keep this program going and not have to inform our customer base that we are taking anything back from them when we need them the most.

**D. Motion for Entry of Authorizing (A) Payment of Prepetition Employee Wages, Salaries, and Other Compensation and Befits and Continuation of Employee Benefits Programs and Related Administrative Obligations in the Ordinary Course; (B) Authorizing and Directing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto; and (C) Granting Related Relief (the "Employee Wage Motion")**

39. The Debtors pay their employees every two (2) weeks, in arrears. The Debtors timely made payroll on December 1 and December 2, 2020, for the two week period ending on November 27, 2020. Accordingly, as of the Petition Date, the Debtors are obligated to their

---

[4] Available at https://www.justice.gov/ust-regions-r07/region-7-chapter-11.

employees for the period from November 28, 2020 through the Petition Date. The Debtors thus seek the Court's approval to pay accrued unpaid pre-petition wages.

40. It is essential that the Debtors immediately establish the standard of treatment for fulfilling payment obligations to the employees. Any delay in paying these obligations will adversely affect the Debtors' relationship with the employees and could irreparably impair morale. At this critical early stage, the Debtors cannot risk the substantial disruption to its business operations that will result if payment is not permitted. Moreover, the Debtors constitute a relatively small business, and it relies heavily on the particularized skills of its employees. The risk of losing such valued and qualified persons would cripple any reorganization effort.

41. The Debtors maintain several health and welfare benefits plans for eligible employees, for medical, prescription, dental, and vision care coverage and certain other welfare benefits, including short and long term disability insurance (the "Health and Welfare Benefits"). The Health and Welfare Benefits and related obligations incur a monthly average of approximately $54,657.21. Failure to continue the Health and Welfare Benefits could cause employees to experience severe hardship and make it difficult to retain the workforce.

42. Finally, the Debtors also owe premiums to various insurance carriers on account of employee benefits, including vision, dental, long term disability, and similar insurance programs (the "Health and Welfare Benefits"). The Health and Welfare Benefits and related obligations incur a monthly average of approximately $54,657.21. It is essential for the Debtors to continue providing the Health and Welfare Benefits to its employees in order to maintain morale and the health and safety of its employees, particularly given the ongoing pandemic. It is thus critical that the Debtors stay current with the benefits providers. Moving to an alternative benefits provider would be impracticable and costly.

### E. Motion to Pay Prepetition Critical Vendors (the "<u>Critical Vendor Motion</u>")

43. The Debtors request authority to pay certain critical vendors (the "<u>Critical Vendors</u>") set forth in the Critical Vendor Motion. It is critical for the Debtors to continue their business relationships with each of the Critical Vendors, uninterrupted to the greatest extent possible. In the Debtors' two kitchens, the Debtors cook pre-prepared meals in generally three large "cooks" each week. Each "cook" produces 25,000 meals in the Dallas kitchen and 10,000 to 15,000 meals in the Philadelphia kitchen, for a total of approximately 75,000 and 40,000 meals per week, respectively.

44. To produce these meals, the Debtors consume massive quantities of ingredients including meats, vegetables, and spices. Once cooked, these meals must then be packaged and shipped to the retail locations or direct to customers. The smooth operation of supply lines is critical to the business – if even one ingredient is not timely supplied, it can cause an entire "cook" to be delayed or halted, to the great detriment of the Debtors' business. Therefore, the success of these Bankruptcy Cases depends on the successful maintenance of the Debtors' supply-lines. In order to accomplish the same, there are several Critical Vendors who must be maintained.

45. Even if the Critical Vendors are not sole-source suppliers because others in the market are technically capable of replacing them, the Critical Vendors are for all intents and purposes sole-source suppliers because the Debtors cannot replace them quickly enough. With a "cook" approximately every other day, new suppliers would need to be obtained within twenty-four hours of the initiation of these Bankruptcy Cases, on similar terms and able to immediately supply literally tons of ingredients. Other Critical Vendors supply the containers which the Debtors use to package and ship their products. These have up to an eight (8) week lead time; therefore, a replacement vendor would be able to supply the Debtors only after the damage has been done. Further, new vendors may cause the Debtors to incur additional costs and higher prices

given the Debtors' current creditworthiness. With respect to the Critical Vendors, the Debtors do not have executory contracts where the Debtors could compel performance; while certain executory contracts govern pricing and other commercial terms, they still require payment in order to compel post-petition service. Therefore, the Debtors face the prospect that the Critical Vendors will simply refuse to sell any further goods or services to the Debtor without immediate payment of amounts due.

46. The Debtors only seek authority to pay these amounts in the Debtors' discretion, as opposed to being ordered to pay these amounts. Under the circumstances and in light of the COVID-19 pandemic, the Debtors intend to negotiate with the Critical Vendors to obtain favorable post-petition credit terms and reduction of total amounts owed in exchange for these payments. The Debtors will pay these claims only if necessary to avoid immediate and irreparable harm, and only if the Critical Vendors will ensure that it will continue to do business with the Debtors on prepetition or similar terms. Moreover, all payments will remain subject to disgorgement, if so ordered by the Court, due to administrative insolvency or if the Critical Vendors refuse to provide goods or services to the Debtors post-petition. Thus, the Court will retain control to guard against any inequitable behavior.

47. None of the vendors the subject of the Critical Vendor Motion are insiders or are affiliated with the Debtors. All are third-parties engaged in arm's length transactions with one or more of the Debtors.

**F. Motion for Entry of Interim and Final orders (A) Authorizing Post-Petition Secured Financing; (B) Authorizing the Debtors to Use Cash Collateral; (C) Provide Adequate Protection to the Prepetition Lender; (D) Modifying the Automatic Stay; (E) Scheduling a Final hearing; and (F) Providing Related Relief (the "<u>DIP Motion</u>")**

48. The Debtors seek, *inter alia*, to enter into post-petition financing for the principal sum of $2,7250,000.00 by and through certain lending agreements with the DIP Lender. The

Debtors believe that the proposed DIP Facility (defined below) represents significantly better-than-market terms to the Debtors, including an extended repayment term, PIK interest at the lowest possible rate under applicable tax law, and zero adequate protection payments during the pendency of these cases.  In light of the business losses and worldly economic and social circumstances, there is no replacement financing available to the Debtors, and certainly no replacement financing available under better terms.

49.     The DIP Facility is absolutely vital to maintaining the Debtors' ongoing operations, importantly including preservation of approximately 190 jobs (and approximately 75 additional temporary employee engagements) and servicing customers that are, more today than ever, in need of healthy and conveniently delivered food options.  Without the DIP Lender's willingness to infuse new capital into a struggling business, the Debtors would be forced to close its doors, both literally and electronically.

50.     Accordingly, the Debtors are requesting entry of an interim order and a final order providing for, among other things:

(a) authorization of the Debtor to obtain senior secured, post-petition financing on a priming, super-priority basis from the DIP Lender in the aggregate principal amount of $2,725,000.00, including (i) $2,000,000.00 in new-money post-petition financing by that certain Post-Petition Financing Promissory Note dated December 4, 2020, and (ii) a "roll-up" of two bridge loans made by the Lender by that certain Secured Promissory Note dated November 17, 2020, and that certain the Secured Promissory Note dated December 1, 2020, in the aggregate principal amounts of $450,000.00 and $275,000.00, respectively (collectively, the "DIP Facility");

(b) authorizing SKI and, to the extent applicable, all other Debtors to enter into, execute, deliver, and perform under the DIP Facility and all related agreements or documents creating, evidencing, or securing indebtedness or obligations of the Debtors to the DIP Lender described in the DIP Facility, including the Ratification and Lending Agreement and the Security Agreement (together with the DIP Facility, the "DIP Documents");

(c) approving the terms and conditions of the DIP Documents;

(d) granting valid, enforceable, non-avoidable, and automatically fully perfected priming liens on, and security interests in, the applicable collateral;

(e) granting allowed superpriority administrative claims to the DIP Lender with respect to the DIP Facility;

(f) finding the DIP Lender a "good faith" lender; and

(g) authorizing the use of the full amount of the DIP Lender's cash in accordance with the terms and conditions set forth in the DIP Documents

51. Based in large part on exacerbated operating losses under current economic conditions and in light of the Debtors' significant and immediate operating capital needs, I believe that approval of the DIP Facility and authorization of use of Cash Collateral, for all of the enumerated reasons set forth in the DIP Motion, affords the Debtors the best chance at a successful reorganization.

**G. Motion of Debtors for an Order (i) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies; (ii) Establishing Procedures for Resolving Objections by Utility Companies; (iii) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service; and (iv) Granting Related Relief (the "<u>Utilities Motion</u>")**

52. The Debtors' various locations receive utility services from many providers, including water, electricity, phone, and gas services. The uninterrupted and continuing services of these providers are critical to the Debtors' operations and successful transition and performance in these Bankruptcy Cases.

53. The Debtors propose to provide adequate assurance of future payments to these utility providers as outlined in the proposed order on the Utilities Motion. The Debtors will escrow the equivalent of one month of the average monthly spend (for the past twelve months) for each provider. If the Debtors default on post-petition payments to a utilities provider, that provider may make demand on the escrow account. Utilities providers shall have the opportunity to object to

this proposed procedure, and if no alternative adequate assurances can be agreed upon, the Court shall decide.

54. The known utility providers and the proposed adequate assurance amount as to each are reflected on Exhibit "A" to the Utilities Motion.

### H. Emergency Consideration

55. As discussed above, the Debtor's financial situation has been jeopardized due to market conditions beyond the Debtors' control, including the ongoing COVID-19 pandemic and retail ramifications related thereto. The Debtors, therefore, initiated the Bankruptcy Cases to reorganize their financial affairs and obtain a fresh start. But the Debtors' situation is precarious, and any further shocks to its system could be detrimental. I thus believe that emergency consideration of the First-Day Motions is necessary to avoid immediate and irreparable harm to the business, its stakeholders, employees, vendors, and loyal customer base. The Debtors simply cannot continue to survive without the support of its employees, contractors, and critical vendors, which will not be possible if the Debtors do not rapidly obtain authority to enter into the DIP Facility, and infuse immediate working capital. Therefore, the Debtor's prospects for reorganization depend on emergency consideration of the First-Day Motions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 4, 2020.

*/s/ Anthony Smith (by permission)*
Anthony Smith
Chief Executive Officer